IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:15-CR-354 |
| JOSIAH JOHN WEISS ) | |
| ) | |

## MEMORANDUM OPINION

An indictment has issued charging defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). At issue on defendant's pre-trial motion is whether controlling precedent requires exclusion of the testimony of a firearms seller who, when shown a single photograph of defendant one to three hours after a firearms sale, was able to identify defendant as the person who purchased and took possession of three firearms from him. Defendant claims that showing the seller a single photograph of defendant constitutes an unduly suggestive identification that must be excluded. The government contends that exigent circumstances required the use of the single photograph, and in any event, that the totality of the circumstances confirms the reliability of the identification.

The matter has been fully briefed, argued orally, and resolved by a bench ruling denying the motion on the basis of findings of fact and conclusions of law. *United States v. Weiss*, 1:15-cr-354 (Feb. 26, 2016) (Order) (Doc. 48). This Memorandum Opinion records and elucidates the reasons for denying defendant's motion to exclude.

I.

On February 26, 2016, the following witnesses testified during a hearing on defendant's motion to exclude the testimony of an unduly suggestive identification of defendant:

1

(i) Stephen L. Smith, Jr., a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF");

(ii) Jerry Crawford, the firearms seller who identified defendant as the purchaser of three firearms from him;

(iii) Brian Guay, an ATF special agent; and

(iv) Shannon Davis, defendant's brother.

The testimony of all four witnesses was cogent and credible. The pertinent facts, derived from the testimony of these four witnesses and the exhibits admitted during the February 26, 2016 hearing, may be succinctly summarized.

- On April 25, 2015, several ATF special agents conducted surveillance operations at The Nation's Gun Show at the Dulles Expo Center in Chantilly, Virginia, within the Eastern District of Virginia.

- At The Nation's Gun Show, federal firearms license holders sell firearms and other weapons. Private individuals, who are not federal firearms license holders, also advertise the sale of their personal firearms.

- ATF special agent Smith and his partner were assigned that day to a group responsible for patrolling the parking lot to look for unlawful firearms purchases.

- Shortly after 4:00 p.m., ATF special agent Smith observed an African-American male with long dreadlocks, speaking on a cellular phone and standing on a sidewalk outside the Dulles Expo Center. This individual was wearing a red sweater with a yellow strip and a knit cap. ATF special agent Smith observed the individual from approximately ten feet away from the individual.

- During this observation, ATF special agent Smith was seated in the front passenger's seat of an unmarked law enforcement vehicle, while his partner drove that vehicle slowly through the parking lot.

- Thereafter, at approximately 4:30 p.m., ATF special agent Smith observed the same African American male speaking with a Caucasian male, later identified as Jerry Crawford, at the rear of a red Volkswagen Passat. The vehicle's trunk was open.

- ATF special agent Smith took several photos of the interaction between the African American male and Crawford.

- ATF special agent Smith observed Crawford showing what appeared to be a firearm to the African American male (hereinafter the "Buyer"). Although ATF special agent Smith

was not close enough to observe the faces of Crawford and the Buyer, ATF special agent Smith was able to identify the Buyer as the same individual he had observed at approximately 4:00 p.m. because (i) the Buyer was wearing the same distinctive red sweater with a yellow stripe and the same knit cap, and (ii) the Buyer had the same distinctive long dreadlocks.

- At this point, ATF special agent Smith used his radio to alert other ATF special agents stationed around the The Nation's Gun Show that ATF special agent Smith and his partner were observing what appeared to be a suspicious firearms transaction in the parking lot.

- ATF special agent Smith and his partner remained stationary in their vehicle and continued to observe the interaction.

- ATF special agent Smith next observed what appeared to be a transaction for a firearm. Specifically, ATF special agent Smith observed: (i) the Buyer hand to Crawford what appeared to be currency, and (ii) Crawford hand to the Buyer what appeared to be a pistol case.

- After Crawford and the Buyer spoke for a few more minutes, and after the Buyer appeared to handle something in the trunk, ATF special agent Smith observed: (i) the Buyer hand to Crawford what appeared to be additional currency, and (ii) Crawford hand to the Buyer what appeared to be a second pistol case.

- ATF special agent Smith then observed: (i) the Buyer hand to Crawford what appeared to be currency, (ii) Crawford hand to the Buyer what appeared to be a rifle case, and shortly thereafter, (iii) the Buyer walk across the parking lot, carrying what appeared to be two pistol cases and a rifle case.

- In total, the interaction between Crawford and the Buyer lasted approximately fifteen minutes. ATF special Agent Smith observed the interaction for approximately ten minutes.

- Although ATF special agent Smith was unable to maintain eyes on the Buyer as the Buyer walked across the parking lot, other ATF special agents were able to maintain a visual on the buyer during his entire walk across the parking lot. Specifically, another ATF special agent, who was located in a sixth floor hotel room, was able to follow, with the aid of binoculars, the Buyer's progress as the Buyer walked across the parking lot.

- The ATF special agent located in the sixth floor hotel room called out the progress of the Buyer over the radio. He also observed and informed other ATF special agents that the Buyer had placed the firearms cases in a two-door Chrysler Crossfire and entered the driver's seat of the vehicle.

- At this time, an ATF special agent reported over the radio the vehicle's license plate information, including the Maryland license plate number.

- Shortly thereafter, the Chrysler Crossfire left the parking lot. ATF special agents followed the vehicle because they were concerned (i) that on the basis of the Maryland license plate, the private-party sale was in violation of Virginia law as a sale of a firearm to a non-Virginia resident, and (ii) that the Buyer of the firearms may have been a six-time felon.

- While following the Chrysler Crossfire, ATF special agent Smith and other ATF special agents observed the Buyer driving erratically and reaching speeds well above the posted speed limit.

- ATF special agent Smith observed the Chrysler Crossfire travel northbound onto 395 and exit at Little River Turnpike. ATF special agents continued their pursuit, but did not activate their emergency lights. The ATF special agents lost track of the Chrysler Crossfire somewhere in Alexandria, Virginia.

- During the pursuit of the Chrysler Crossfire, ATF special agents learned (i) that defendant's name was associated with the address of the vehicle's registered owner and (ii) that defendant was a six-time felon, and (iii) that defendant was on supervised release for a prior conviction.

- Also during the pursuit of the Chrysler Crossfire, ATF special agent Guay, who had also been conducting surveillance at the Nation's Gun Show, identified Crawford's name and located Crawford's address by querying the Volkswagen's license plate number in a law enforcement database.

- ATF special agent Guay then drove to Crawford's residence to conduct an interview.

- ATF special agent Guay sought to interview Crawford as soon as possible in order to determine whether Crawford had sold firearms to defendant and, if so, to confirm the types of firearms sold.

- This information was critical in determining (i) whether to allocate ATF resources in order to locate the defendant, (ii) whether defendant committed a federal crime, (iii) whether to ask the United States Attorney's Office to help the ATF obtain a criminal complaint and arrest warrant, (iv) to confirm the type of firearms sold, and (iv) to input these firearms into a law enforcement database in order to alert authorities in the event that law enforcement later recovered these firearms at the scene of a crime.

- ATF special agent Guay arrived at Crawford's home between one and three hours after the sale at The Nation's Gun Show, and Crawford invited ATF special agent Guay into Crawford's residence.

- Once inside Crawford's residence, ATF special agent Guay informed Crawford that ATF special agent Guay was there to ask Crawford questions about Crawford's sale of firearms at The Nation's Gun Show at the Dulles Expo Center in Chantilly, Virginia.

- Crawford advised ATF special agent Guay (i) that he went to The Nation's Gun Show to sell his personally owned firearms and (ii) that he walked around the Dulles Expo Center with a sign that advertised that he was selling firearms.

- Crawford further informed ATF special agent Guay that Crawford was unable to sell his firearms while inside the Dulles Expo Center, but that when Crawford left the expo and returned to his vehicle in the parking lot, an individual approached Crawford to ask to purchase firearms.

- Crawford then provided information, which was consistent with what ATF special agent Smith had observed. Specifically, Crawford confirmed that he sold to the individual who had approached him in the parking lot the following three firearms: (i) a Tanfoglio Model Witness PS .9mm semi-automatic pistol; (ii) a Tisas Model Zig M 1911 .45 semi-automatic pistol; and (iii) an AR-15 semi-automatic rifle with an Anderson Manufacturing lower receiver.

- Thereafter, ATF special agent Guay displayed on his smartphone a photograph of defendant and showed that photo to Crawford.

- ATF special agent Guay decided to show Crawford a single photograph, rather than waiting to prepare a formal photographic array, because ATF special agent Guay believed it would take several hours, if not days, to complete a formal photographic array and because ATF special agent Guay considered the circumstances to be exigent, as he reasonably believed a six-time felon was in possession of three firearms and was driving erraticaly.

- Upon seeing the photograph of defendant on ATF special agent Guay's smartphone, Crawford immediately and confidently identified defendant as the person to whom he had sold firearms earlier that day.

- Also during the interview, Crawford indicated that during the transaction in the parking lot, the Buyer had long hair, was wearing a knit cap, and used the name "Brian."

- The single photograph of defendant displayed on the smartphone and shown to Crawford was a booking photograph of defendant in which defendant is shown without long hair.

- The name "Brian Anthony Hill" is one defendant's known aliases.

- On April 29, 2015, a magistrate judge in the Eastern District of Virginia issued a criminal complaint and arrest warrant. *See United States v. Weiss*, Case No. 1:15-cr-354 (April 29, 2015) (Docs, 1, 5).

- Shortly thereafter, on May 4, 2015, a second arrest warrant was issued for defendant's violation of his supervised release. *See United States v. Weiss*, Case No. 1:11-cr-112 (May 4, 2015) (Doc. 35).

- The U.S. Marshals Service was assigned to locate and arrest defendant for the arrest warrant issued for his supervised release violation.

- On November 9, 2015, the United States Marshals Service received information that the defendant's Chrysler Crossfire had been recently towed from an apartment in Suitland, Prince George's County, Maryland.

- On November 10, 2015, deputies from the United States Marshals Service conducted surveillance near the suspected apartment complex located in Suitland.

- There, deputies apprehended defendant. Law enforcement also seized a set of keys. One of the keys corresponded to an apartment in a nearby complex.

- Law enforcement obtained a Maryland state search warrant for the apartment, and the search revealed numerous marijuana plants within the apartment.

- While executing the search warrant of the apartment, law enforcement observed a second key chain and determined that a key on the second key chain granted access to a second apartment in a nearby apartment complex.

- After obtaining a Maryland state search warrant for the second apartment, law enforcement searched the second apartment.

- During the search of the second apartment, ATF special agent Smith seized a red shirt with a yellow stripe and a knit cap. ATF special agent Smith identified the seized shirt and knit cap as identical to the shirt and knit cap worn by the Buyer during the April 25, 2015 firearms purchase.

- The government called defendant's brother, Shannon Davis, to testify at the February 26, 2016 hearing. Davis testified that defendant called Davis at some point in April 2015. During that telephone call, defendant told Davis (i) that defendant had just purchased firearms in the parking lot of the Dulles Expo Center and (ii) that defendant believed he was being followed.

- According to Davis, defendant was driving his mother's Chrysler Crossfire at the time, and when defendant called Davis, it sounded to Davis as if defendant was in a car.

## II.

Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

6

Importantly, however, as the Fourth Circuit has made clear, "the Due Process Clause is not implicated if the 'identification was sufficiently reliable to preclude the substantial likelihood of misidentification.'" *United States v. Saunders*, 501 F.3d 384, 389 (4th Cir. 2007) (quoting *United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997)). Thus, as the Fourth Circuit has explained, "[t]he consideration of whether the identification testimony is admissible proceeds in two steps." *Id.* A defendant must first show by a preponderance of the evidence that "law enforcement officers use[d] an identification that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (citations omitted). If a defendant cannot show that the eyewitness identification was both unduly suggestive and unnecessary given the circumstances, the inquiry ends. *See id.* at 726. If, on the other hand, the defendant meets his burden under the first step, a court then considers whether the identification was nevertheless reliable in the context of all the circumstances, and therefore admissible. *See Saunders*, 501 F.3d at 389-90.

Here, the government concedes that the use of a single photograph in Crawford's identification of defendant was unduly suggestive. Thus, the questions presented are (i) whether defendant has shown by a preponderance of the evidence that the use of the single photograph was unnecessary given the circumstances, and (ii) if so, whether the identification based on the single photograph was nevertheless reliable. Each question is addressed separately.

### A.

Defendant contends that the presentation of a single photograph, rather than a photographic array, to Crawford was unnecessary. The government, on the other hand, contends that given the exigent circumstances, the use of the single photograph was necessary to the government's investigation.

The Supreme Court has long recognized that there may be an overriding necessity that justifies displaying a single photograph in exigent circumstances. In this regard, the Supreme Court's decision in *Simmons v. United States*, 390 U.S. 377 (1968), is instructive. There, on the day of an armed robbery, witnesses identified the defendants as the main suspects with respect to that robbery. *Id.* at 380. Specifically, the morning following the robbery, the Federal Bureau of Investigation ("FBI") obtained approximately six photographs of the two defendants from one of the defendant's sister. *Id.* at 382. Later that same day, the FBI showed these photographs to the five bank employees who witnessed the robbery, and the five bank employees all identified defendant Simmons. *See id.* In upholding the display of photographs the Supreme Court reasoned:

> A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to [defendants]. It was essential for FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities.

*Id.* at 384-85.

The present case is on all fours with *Simmons*. Here, as in *Simmons*, government agents had reason to believe a serious felony had been committed. Specifically, government agents reasonably believed that a six-time felon was in possession of two pistols and a rifle and that the six-time felon was driving erratically and at high speeds. Under these exigent circumstances, it was necessary for government agents to act quickly. Showing Crawford the single photograph—rather than waiting hours, if not days, to prepare and present a photographic array—was necessary to confirm quickly (i) that firearms were sold to defendant, a six-time felon, and (ii) if firearms were sold to defendant, the types of firearms in defendant's possession.

Indeed, swift action was of greater necessity here than in *Simmons*. Here, ATF special agent Guay showed Crawford the photograph of defendant within three hours of the suspected crime, whereas the Supreme Court in *Simmons* upheld a procedure in which the police did not show witnesses the suggestive photographs until a day after the crime. As the Seventh Circuit has noted on similar facts, "[w]ith the crime much closer at hand [than in *Simmons*], the rationale for upholding the procedure as necessary is even more pressing." *United States v. Sanders*, 708 F.3d 976, 987 (7th Cir. 2013) (finding an identification necessary where it was obtained by an officer showing a witness a photograph of a suspect only a couple hours after the suspected crime). In this regard, as the Seventh Circuit noted, "[i]t would have taken significantly more time for the police to leave the scene, go to the station house, locate photos similar to those [it had already], and return." *Id*. During such an extended time period, "[a] dangerous suspect could ... facilitate his escape." *Id*. So, too, here had ATF special agent Guay returned to his office in order to compile a photographic array before interviewing Crawford and presenting the photographic array to Crawford for an identification, ATF special agent Guay would have been unable to confirm quickly that firearms, including a rifle, were in the possession of a six-time felon. Thus, defendant cannot show that the use of the single photograph was unnecessary given the exigent circumstances.[1]

Accordingly, defendant's motion to exclude the testimony of the unduly suggestive identification must be denied because defendant has failed to establish that Crawford's

---

[1] Nor is the government's argument regarding exigent circumstances undermined by the fact that it took the government approximately six months to apprehend defendant. Exigent circumstances recited to support reliance on an unduly suggestive photograph are independent of the time it ultimately takes to apprehend a fugitive. To conclude otherwise would lead to the anomalous result that a defendant could erase exigent circumstances by avoiding arrest for a long period.

identification based on a single photograph was unnecessary in light of the exigent circumstances.

**B.**

Moreover, even assuming, *arguendo*, that that the use of the single photograph was both unduly suggestive and unnecessary, Crawford's identification is still admissible because it is reliable.

An out of court identification from an impermissibly suggestive identification process will still be admitted at trial if the identification was "nevertheless reliable under the totality of the circumstances." *United States v. Greene*, 704 F.3d 298, 308 (4th Cir. 2013) (quoting *Satcher v. Pruett*, 126 F.3d at 561, 566 (4th Cir. 1997)). As the Fourth Circuit has explained, a court may consider the following factors in measuring reliability:

(i) "the witness' opportunity to view the perpetrator at the time of the crime";

(ii) "the witness' degree of attention at the time of the offense";

(iii) "the accuracy of the witness' prior description of the perpetrator";

(iv) "the witness' level of certainty when identifying the defendant as the perpetrator at the time of the confrontation"; and

(v) "the length of time between the crime and the confrontation."

*United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). Importantly, these five factors, known as the "*Biggers* factors," are not a mandatory checklist, and "[c]ourts may consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification." *Id.*[2]

---

[2] The government further cites *Wilkerson* for the proposition that courts may "consider other evidence [not related to the identification] of the defendant's *guilt* when assessing the reliability of [an] identification." *Id.* at 695 (emphasis added). Yet, that proposition appears to be in tension with the holding of *United States v. Greene*, 704 F.3d 298, 310 (4th Cir. 2013), that "evidence

10

Here, the five *Biggers* factors point persuasively to the conclusion that Crawford's identification was reliable. Specifically, the following indicia of reliability are present here:

(i) Crawford had ample time, in close proximity, to view the Buyer, as the firearms transaction lasted approximately 15 minutes;[3]

(ii) Crawford's attention was focused on the Buyer during the firearms transaction;[4]

(iii) Crawford made the identification confidently and without hesitation,[5]

(iv) without prompting from government agents, Crawford further described the Buyer as having long hair, despite the fact that in the single photograph shown to Crawford, defendant does not have long hair;[6] and

(v) the length of time between the firearms transaction and Crawford's identification of defendant was short, as a period of only one to three hours had passed.[7]

---

extrinsic to an identification cannot be considered in evaluating the reliability of the identification." *Id.* at 310. The government insists that *Wilkerson* controls here, and that the Fourth Circuit in *Greene* misstated the law. Importantly, however, the issue need not be addressed here because the *Biggers* factors, which relate to evidence intrinsic to the identification, are sufficient to establish the reliability of Crawford's identification. Reliance on extrinsic evidence is unnecessary here to establish reliability.

[3] *See United States v. Saunders*, 501 F.3d 384, 392 (4th Cir. 2007) (finding an identification reliable where the witness made eye contact with the suspect and was able to view him from a few feet away for a few seconds); *United States v. Jones*, 535 F.3d 886, 891-92 (8th Cir. 2008) (finding an identification reliable where the witness "interacted directly" with the defendant bank robber and had a clear view of him when few were present in the bank).

[4] *See Keene v. Mitchell*, 525 F.3d 461, 466 (6th Cir. 2008) (finding an identification reliable where a witness was fully attentive to defendant in a well-lit area when he robbed her at gunpoint); *United States v. Brownlee* (3d Cir. 2006) (finding an identification reliable where witnesses' degree of attention was "substantial" and where one witness stood face-to-face with a carjacker for thirty seconds and the other viewed the carjacking as it was happening).

[5] *See Biggers*, 409 U.S. at 199 (holding that an identification is more likely reliable where the witness displays a high "level of certainty when identifying the defendant as the perpetrator").

[6] *See Biggers*, 409 U.S. at 199 (holding an identification is more likely reliable when the witness' "description of the perpetrator," separate and apart from the photograph, is "accura[te]").

11

Thus, Crawford's identification of defendant as the Buyer of Crawford's firearms was not only necessary given the exigent circumstances, it was also reliable pursuant to the *Biggers* factors.[8]

Accordingly, defendant has failed to meet his burden, and therefore defendant's motion to exclude testimony of an unduly suggestive identification must be denied.

### III.

For the reasons stated here, defendant's motion to exclude testimony of an unduly suggestive identification is denied.

An appropriate Order has already issued.

Alexandria, Virginia
March 7, 2016

                                         /s/
                            T. S. Ellis, III
                            United States District Judge

---

[7] *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (finding reliable an identification based on a single photograph made two days after the encounter with defendant); *Amador v. Quarterman*, 458 F.3d 397, 415 (5th Cir. 2006) (finding reliable an identification made three months after an alleged shooting)

[8] Although it is unnecessary to rely on evidence extrinsic to the identification to establish reliability here, it is worth noting the testimony of defendant's brother, Shannon Davis, further bolsters the conclusion that Crawford's identification on the basis of a single photograph was reliable. Specifically, Davis testified that defendant called him at some point in April 2015 and that during that telephone call, defendant told Davis (i) that defendant had just purchased firearms in the parking lot of the Dulles Expo Center and (ii) that defendant believed he was being followed. Davis further testified that defendant was driving his mother's Chrysler Crossfire at the time of the telephone call and that when defendant called Davis it sounded to Davis as if defendant was in a car.